# 12-1578

## In the United States Court of Appeals for the Second Circuit

SHUI W. KWONG; GEORGE GRECO; GLENN HERMAN; NICK LIDAKIS; TIMOTHY S. FUREY; DANIELA GRECO; NUNZIO CALCE; SECOND AMENDMENT FOUNDATION, INC.; THE NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC.,

*Plaintiffs-Appellants*,

*v.*

MICHAEL R. BLOOMBERG, in his Official Capacity as Mayor of the City of New York; CITY OF NEW YORK,

*Defendants-Appellees*,

ATTORNEY GENERAL OF THE STATE OF NEW YORK,

*Intervenor-Appellee*,

ERIC T. SCHNEIDERMAN, in his Official Capacity as Attorney General of the State of New York,

*Defendant*.

Appeal from a Judgment of the United States District Court for the Southern District of New York; Hon. John G. Koeltl, District Judge, District Court No. 11 Civ. 2356

### PETITION FOR REHEARING *EN BANC*

David D. Jensen
DAVID JENSEN PLLC
111 John Street, Suite 230
New York, New York 10038
(212) 380-6615 tel
(917) 591-1318 fax
david@djensenpllc.com

*Attorney for Plaintiffs-Appellants*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................1

I.    THE STANDARD OF REVIEW FOR LAWS THAT BURDEN THE RIGHT TO KEEP
      AND BEAR ARMS IS A QUESTION OF EXCEPTIONAL IMPORTANCE ........................4

II.   THE PANEL'S CONCLUSION THAT THE FEE STATUTE "DOES NOT BURDEN"
      A CONSTITUTIONAL RIGHT CONFLICTS WITH SUPREME COURT DECISIONS .........6

III.  THE PANEL'S CONCLUSION THAT GREATER-THAN-NOMINAL FEES CAN BE
      IMPOSED ON PERMISSION TO EXERCISE "CORE" ACTIVITIES CONFLICTS
      WITH SUPREME COURT PRECEDENT ..................................................................10

CONCLUSION ................................................................................................15

# TABLE OF AUTHORITIES

## CASES

Breedlove v. Shuttles, 302 U.S. 277 (1939) ............................................................12

Bullock v. Carter, 405 U.S. 134 (1972) ............................................................. 8-9

Chwick v. Mulvey, 915 N.Y.S.2d 578, 81 A.D.3d 161 (App. Div. 2010) ...............2

District of Columbia v. Heller, 554 U.S. 570 (2008) .................................... 1-2, 4, 6

E. Conn. Citizens Action Group v. Powers, 723 F.2d 1050 (2d Cir. 1983) ............14

Ezell v. Chicago, 651 F.3d 684 (7th Cir. 2011) .......................................................5

Follett v. McCormick, 321 U.S. 573 (1944) ...........................................................11

Forsyth County v. Nationalist Movement, 505 U.S. 123 (1992) .............................14

Harper v. Va. Bd. of Elections, 383 U.S. 663 (1966) ...................................... 11-12

Int'l Women's Day March Planning Comm. v. San Antonio, 619 F.3d 346
    (5th Cir. 2010) ................................................................................... 12, 15

Kachalsky v. Westchester, 701 F.3d 81 (2d Cir. 2012) ......................................... 4-5

Kadramas v. Dickinson Public Schools, 487 U.S. 450 (1988) .................................9

Kovacs v. Cooper, 336 U.S. 77 (1949) ...................................................................14

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ..............................................8

McDonald v. City of Chicago, 130 S. Ct. 3020 (2010) .......................................1, 4

Murdock v. Pennsylvania, 319 U.S. 105 (1943) ......................................... 10-11, 13

Nat'l Awareness Found. v. Abrams, 50 F.3d 1159 (2d Cir. 1995) .........................14

Nat'l Rifle Ass'n of Am., Inc. v. BATF, 700 F.3d 185 (5th Cir. 2012) ...................5

Nitkin v. Administrator, 399 N.Y.S.2d 162, 91 Misc. 2d 478
    (Supr. Ct. N.Y. Co. 1975), aff'd 389 N.Y.S.2d 1022, 55 A.D.2d 566
    (App. Div. 1976), aff'd 371 N.E.2d 535, 43 N.Y.2d 673 (1977) .........................3

O'Connor v. Scarpino, 638 N.E.2d 950, 83 N.Y.2d 919 (1994) .............................2

Rockefeller v. Powers, 74 F.3d 1367 (2d Cir. 1996) ...............................................9

Stonewall Union v. Columbus, 931 F.2d 1130 (6th Cir. 1991) ..............................13

Sullivan v. Augusta, 511 F.3d 16 (1st Cir. 2007) ............................................. 12-13

Turley v. Police Dep't, 167 F.3d 757 (2d Cir. 1999) ..............................................14

<u>United States Labor Party v. Codd</u>, 527 F.3d 118 (2d Cir. 1975) ..........................14

<u>United States v. Masciandaro</u>, 638 F.3d 458 (4th Cir. 2011) ...................................5

<u>United States v. Rene E.</u>, 583 F.3d 8 (1st Cir. 2009)...................................................5

<u>United States v. Skoien</u>, 587 F.3d 803 (7th Cir. 2009), <u>vacated en banc</u>,
   614 F.3d 638 (7th Cir. 2010) ....................................................................................6

<u>Waller v. City of New York</u>, 933 N.Y.S.2d 541, 34 Misc. 3d 371
   (Supr. Ct. N.Y. Co. 2011) .....................................................................................12

**STATUTES**

N.Y. Penal L. § 400.00 .................................................................................2-3, 7-8

N.Y. Penal L. § 265.01 ..........................................................................................2

N.Y. Penal L. § 265.20 ..........................................................................................2

N.Y.C. Admin. Code § 10-131 ................................................................................3

38 RCNY § 5-23 .....................................................................................................2

**INTRODUCTION**

The nature and contours of the right to keep and bear arms is a matter of exceptional importance, as the Supreme Court has only recently recognized the Second Amendment as an individual right and incorporated it against the states. This case is the first time that this Court has reviewed a significant burden on the ability of law-abiding, responsible adults to possess handguns in their homes.

In addition, the Panel's decision conflicts with Supreme Court precedents. First, the Panel's characterization of the equal protection burden cannot be reconciled with Supreme Court decisions that have addressed other statutes that delegated authority to state actors. Second, the Supreme Court has rejected fees imposed on the basic ability to exercise a fundamental right.

**BACKGROUND**

The Second Amendment mandates that "citizens *must be permitted* to use handguns for the core lawful purpose of self-defense." McDonald v. City of Chicago, 130 S. Ct. 3020, 3036 (2010) (quotation and alteration omitted; emphasis added). If a state imposes a license or registration requirement, it *must* issue the requisite license and/or registration to an applicant who is qualified. For example, the D.C. laws at issue in District of Columbia v. Heller, 554 U.S. 570 (2008), prohibited the possession of unregistered guns, and concomitantly prohibited people from registering. See id. at 574. The Supreme Court ordered the following

relief:  "Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home."  Id. at 635.

In New York, state law prohibits people from possessing handguns (including within their homes) unless they hold licenses issued under Article 400 of the Penal Law.  See N.Y. Penal L. §§ 265.01(1), 265.20(3).[1]  Article 400 sets forth various requirements for obtaining handgun licenses and "is the exclusive statutory mechanism for the licensing of firearms in New York State."  O'Connor v. Scarpino, 638 N.E.2d 950, 951, 83 N.Y.2d 919, 920 (1994).  It preempts the field of handgun licensing and prevents localities from enacting inconsistent handgun laws.  See Chwick v. Mulvey, 915 N.Y.S.2d 578, 586-87, 81 A.D.3d 161, 171-72 (App. Div. 2010).  A locality such as New York City is not free to enact its own handgun licensing regime independent of Article 400.

Article 400 directs localities throughout the state to impose a fee for processing licensing applications – but it provides two different fee standards:

> In [New York City], the city council and in the county of Nassau the Board of Supervisors shall fix the fee to be charged for a license to carry or possess a pistol or revolver and provide for the disposition of such fees.  Elsewhere in the state, the licensing officer shall collect and pay into the county treasury the following fees:  for each license to carry or possess a pistol or revolver, *not less than three dollars nor*

---

[1] This case does not concern the right to carry a handgun outside the home.  See generally 38 RCNY § 5-23(a) (articulating restrictions attendant a "Residence Premises" handgun license).

*more than ten dollars* as may be determined by the legislative body of
the county. . . .

N.Y. Penal L. § 400.00(14) (emphasis added).  Hence, in most of the state, Article

400 requires localities to charge a fee of between $3 and $10, while in New York

City (and Nassau County[2]) Article 400 does not impose any limitation on the

amount of the fee.  The only limitation is the general state-law requirement that

license fees not exceed documented attendant administrative costs.  See, e.g.,

Nitkin v. Administrator, 399 N.Y.S.2d 162, 163, 91 Misc. 2d 478, 479 (Supr. Ct.

N.Y. Co. 1975), aff'd 389 N.Y.S.2d 1022, 55 A.D.2d 566 (App. Div. 1976), aff'd

371 N.E.2d 535, 43 N.Y.2d 673 (1977).

   The result is that most New York localities must finance the bulk of the cost

of issuing handgun licenses from public coffers, while New York City remains free

to shift the full cost of its licensing regime to individuals who choose to exercise

their right.  At the present time, New York City charges $340 for a 3-year handgun

license.  See N.Y.C. Admin. Code § 10-131(a)(2).  Because the license fee

requirement stands as a complete obstacle to obtaining an Article 400 handgun

license, it also stands as a complete obstacle to exercising a recognized "core" of

the Second Amendment right.

---

[2] None of the Plaintiffs holds a Nassau County license.

I.     THE STANDARD OF REVIEW FOR LAWS THAT BURDEN THE RIGHT TO KEEP
       AND BEAR ARMS IS A QUESTION OF EXCEPTIONAL IMPORTANCE

       This is the first time that this Court has addressed both the operation of the

Equal Protection Clause on laws that impose disparate burdens on the right to keep

and bear arms, and also, burdens on the ability of law-abiding adults to keep

handguns at home.  The scope and contours of the Second Amendment right are

matters of exceptional importance for two countervailing reasons:  because the

ultimate issue is the protection of a fundamental constitutional right; and, because

gun laws implicate public safety considerations.

       Second Amendment jurisprudence remains nascent, as the Supreme Court

first recognized the Second Amendment as an individual right five years ago in

Heller, and it first held the right "fully applicable to the States" three years ago in

McDonald, 130 S. Ct. at 3026.  "The full import of the Second Amendment right

and the government's burden to justify the infringement of this right in different

contexts remain opaque."  Slip Op. at 19 (Walker, J., concurring).  This Court has

previously observed that the Heller decision may "raise[] more questions than it

answers."  Kachalsky v. Westchester, 701 F.3d 81, 88 (2d Cir. 2012).

       Courts have developed competing approaches to evaluating burdens on the

right to keep and bear arms.  For example, some courts have looked predominantly

to the historical understanding of the right to determine whether burdens are valid,

while other courts have used the framework of means-end burden analysis.

Compare United States v. Rene E., 583 F.3d 8, 12-16 (1st Cir. 2009) (federal age restriction to possess handguns upheld because of the "longstanding tradition of prohibiting juveniles from both receiving and possessing handguns"), with Nat'l Rifle Ass'n of Am., Inc. v. BATF, 700 F.3d 185, 196 (5th Cir. 2012) (if federal old age limit to purchase handguns falls within the scope of the Second Amendment, then intermediate scrutiny applies).  Some courts have ruled that the level of and rigor of scrutiny depends on the breadth and severity of a burden, see Moore v. Madigan, 702 F.3d 933, 940 (7th Cir. 2012), while others have adopted a more categorical approach.  For example, this Court categorically adopted intermediate scrutiny to review burdens on the right to keep and bear arms that apply outside the home in Kachalsky, 701 F.3d at 96.

While this Court has not previously addressed burdens that apply *inside* the home, guidance from other Circuit Courts suggests that a high level of scrutiny should apply.  See, e.g., Ezell v. Chicago, 651 F.3d 684, 704 (7th Cir. 2011); United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011) ("we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny"); see also Slip Op. at 25 (Walker, J., concurring) ("Courts apply heightened scrutiny when a legislative classification burdens a fundamental right.").  After all, it is the right "to

use arms in defense of hearth and home" that the Second Amendment "elevates above all other interests." Heller, 554 U.S. at 635.

Moreover, there is a substantial chance that the *en banc* Court would treat the burden at issue here differently. A pertinent example is the decision of the Court of Appeals for the Seventh Circuit in United States v. Skoien, 587 F.3d 803 (7th Cir. 2009), vacated en banc, 614 F.3d 638 (7th Cir. 2010). The original Seventh Circuit panel concluded that "intermediate scrutiny" should apply to the federal law that disqualifies domestic violence misdemeanants from possessing guns, and it remanded the case for further consideration of whether the government could justify the burden imposed. See id. at 816. However, when the Seventh Circuit reviewed the matter *en banc*, it declined to use a categorical standard of scrutiny, although it did disclaim rational basis review. See Skoien, 614 F.3d at 641-42 ("we need not get more deeply into the 'levels of scrutiny' quagmire"). Based on its review of legislative history, caselaw, studies, and the available procedures for expunging misdemeanor convictions, the court upheld the restriction as being "substantially relat[ed]" to "preventing armed mayhem, . . . an important governmental objective." See id. at 642-45.

II.   THE PANEL'S CONCLUSION THAT THE FEE STATUTE "DOES NOT BURDEN" A CONSTITUTIONAL RIGHT CONFLICTS WITH SUPREME COURT DECISIONS

The Panel's characterization of the burden conflicts with Supreme Court decisions that characterize statutory disparities under state law. The Panel majority

characterized the differential fee statute as "not requir[ing] the New York City Council to charge a higher (or lower) fee than other jurisdictions in the State," and it therefore found that the rational basis standard should apply. Slip Op. at 15. However, one member of the Panel found that "[t]he fee disparity burdens the exercise of a fundamental right differently for different New York State residents and therefore demands a heightened level of review." Slip Op. at 20 (Walker, J., concurring); see also id. at 24 (Walker, J., concurring) ("Penal Law § 400.00(14) does not operate in a vacuum; it is applied through local legislation that has the result of a gun owner paying a $340 handgun licensing fee in one New York State jurisdiction and a $10 fee in another.").

The disparity here is the *different manner* in which § 400.00(14) delegates fee-setting authority. The original statutory approach, which still applies to most state residents, bounds the fee-setting authority of local governments to a nominal range (presently $3 to $10). The statutory approach that applies to the City bounds fee-setting authority only by the general state-law principle that fees not exceed the costs of the regulatory scheme. Hence, the classification is the difference between a delegation of authority that is bounded by a nominal fee range standard, and a delegation of authority that allows the shifting of full regulatory costs.

This classification causes the Plaintiffs injury. But for its exemption from the fee range, the City would not be able to charge the Plaintiffs a $340 fee, or any

other fee greater than $10 (injury). If the nominal-fee-range standard still applied to everyone, then the City would not be able to do this (traceability). Finally, this Court's order re-imposing the nominal-fee-range standard would redress the Plaintiffs' injury (redressability). See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

The Panel did not cite any authority for its conclusion that "beyond setting the $3-10 fee range applicable to most of New York State—which plaintiffs do not contest—Penal Law § 400.00(14) itself does *nothing* to burden anyone's Second Amendment rights." Slip Op. at 15 (emphasis in source). No such authority is known to counsel.

To the contrary, the proposition that different fee standards do not constitute a burden because the City implements the state law and *could* do so in a manner that would not injure the Plaintiffs is inconsistent with the rationales of established Supreme Court precedents. For example, in Bullock v. Carter, 405 U.S. 134 (1972), the Court overturned a Texas state law that conferred broad discretion on local political parties to set the fees for appearing on the ballot in primary elections "as in their judgment is just and equitable." See id. at 138 (quoting statute). Bullock concerned a different issue than that presented here (the denial of equal protection on the basis of ability to pay, and in the context of ballot access) – but what is significant is that the Court held that the *state law* conferring discretion

-8-

was itself unconstitutional, and the Court affirmed a lower court's order that enjoined enforcement of the statute itself.  See id. at 149.  This Court has previously observed that Bullock "found state action, even though the filing fee requirement applied only to primaries and the political parties were free to fix whatever fees they wished."  Rockefeller v. Powers, 74 F.3d 1367, 1374 (2d Cir. 1996).

And, in Kadramas v. Dickinson Public Schools, 487 U.S. 450 (1988), the Court rejected the claim that a plaintiff could not challenge a state law that authorized some (but not all) localities to impose fees for school busing services with the following explanation:  "The fee that Dickinson is permitted to charge under the 1979 statute is itself a burden rather than a benefit to appellants, and they are not estopped from raising an equal protection challenge to the statute that imposes that burden on them."  Id. at 457.  Significantly, the statute provided (certain) localities with wholly "optional" authority to impose fees, bounded only by the requirement they not exceed costs.  See id. at 454 (quoting statute).  The statute did not "require" localities to impose fees.  See id.

The fact that the City *might* choose to set the fee within the same range applicable to the rest of the state is neither here nor there.  After all, both the local election board in Bullock and the school district in Kadramas *could* have chosen

not to charge fees, or instead, to charge very small fees – which would have resulted in no injury (and hence, no standing) for the plaintiffs in those cases.

III.   THE PANEL'S CONCLUSION THAT GREATER-THAN-NOMINAL FEES CAN BE IMPOSED ON PERMISSION TO EXERCISE "CORE" ACTIVITIES CONFLICTS WITH SUPREME COURT PRECEDENT

The Supreme Court has sustained greater-than-nominal license fees only where those fees were imposed on activities lying on the margin of constitutional protection – rather than on the basic ability to exercise the "core" of a constitutional right.  In Murdock v. Pennsylvania, 319 U.S. 105 (1943), the Court rejected a municipal law that required peddlers to obtain licenses and pay fees of (for example) $1.50 per day or $7.00 per week before selling goods door-to-door. See id. at 106-07.  Key to the Court's resolution was its conclusion that "spreading one's religious beliefs or preaching the Gospel through distribution of religious literature and through personal visitations is an age-old type of evangelism with as high a claim to constitutional protection as the more orthodox types."  Id. a 110; see also Jimmy Swaggart Ministries v. Bd. of Equalization, 493 U.S. 378, 385-86 (1990) (quoting this language to characterize Murdock's holding).  The fee was invalid because it was "a flat license tax levied and collected as a condition to the pursuit of activities whose enjoyment is guaranteed by the First Amendment." Murdock, 319 U.S. at 114.  The Court explained that the fee did not compensate "for the enjoyment of a privilege or benefit *bestowed by the state*."  Id. at 115

-10-

(emphasis added).  Rather, "[t]he privilege in question exists apart from state authority . . . [and] is guaranteed the people *by the Federal Constitution*."  Id. (emphasis added).  One year later, the Court similarly overturned the conviction of a Jehovah's Witness preacher who had been convicted of selling books without obtaining a local licensee for "book sellers" and paying the requisite fee.  See Follett v. McCormick, 321 U.S. 573, 577-78 (1944).  The Court concluded its opinion with the explanation that, while preachers could be subject to "general taxation," they could not "be required to pay a tax for the exercise of that which the First Amendment has made a high constitutional privilege."  Id. at 578.

Likewise, the Court overturned a Minnesota law that imposed a "use tax" (specifically) on the ink and paper used to print newspapers in Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue, 460 U.S. 575, 592-93 (1983).  The Court explained that "[a] tax that burdens rights protected by the First Amendment cannot stand unless the burden is necessary to achieve an overriding governmental interest."  Id. at 582.  Furthermore, the state's interest in collecting revenue was not an adequate interest.  See id. at 586.

In the arena of voting rights, the Supreme Court had only sustained *nominal* poll taxes before it struck down poll taxes entirely in Harper v. Virginia Board of Elections, 383 U.S. 663, 666 (1966).  For example, the Court had upheld Georgia's $1 poll tax in Breedlove v. Shuttles, 302 U.S. 277 (1939), as a "a familiar form of

taxation, much used in some countries and to a considerable extent here, at first in the Colonies and later in the States." Id. at 281. And it should be observed that part of the Court's rationale was that the "privilege of voting is not derived from the United States, but is conferred by the State." Id. at 283. (Recall that the Constitution vests the right to vote in federal elections with state legislatures.)

The rights of petition and assembly often raise somewhat different issues, as the exercise of these rights often involves the use of public facilities such as streets, sidewalks, and parks. Of course, people generally do not *need* to use public property to engage in the acts of petitioning the government or peaceably assembling, and for that matter, they have no absolute right to do so. Cf. Waller v. City of New York, 933 N.Y.S.2d 541, 545, 34 Misc. 3d 371, 375 (Supr. Ct. N.Y. Co. 2011) (no First Amendment right for Occupy Wall Street participants to remain in Zuccotti Park, even though the park was quasi-public). And, a group that cannot afford a permit, or that refuses to pay a permit fee, is not prohibited from assembling or petitioning – rather, it is prohibited from doing so *on public property*. It is significant that several other Circuits addressing the constitutionality of fees have looked to whether alternative, free public fora were available. See Int'l Women's Day March Planning Comm. v. San Antonio, 619 F.3d 346, 372 (5th Cir. 2010) (finding cost-shifting parade fees permissible in part because "there are procession routes that could be used for free"); see also Sullivan

-12-

v. Augusta, 511 F.3d 16, 42 (1st Cir. 2007) (concluding, 2-1, that city did not need to provide an indigency exception for permits to parade on streets because sidewalks and parks could be used for free); Stonewall Union v. Columbus, 931 F.2d 1130, 1137 (6th Cir. 1991) (same conclusion).

      The Supreme Court addressed the constitutionality of fees laid on the right of assembly in Forsyth County v. Nationalist Movement, 505 U.S. 123 (1992), which concerned a county law that allowed authorities to impose a fee of up to $1,000 for a permit to hold a march on public streets.  See id. at 126-27.  The Supreme Court granted certiorari to address the issue of "the constitutionality of charging a fee for a speaker in a public forum," id. at 129, but wound up declining to resolve the question, and instead overturned the county law because of its "variable" nature.  Compare id. at 124, with id. at 137-38 (Rehnquist, C.J., dissenting).  On the issue of nominality, the Court explained simply that the fee in Murdock "was invalid because it was unrelated to any legitimate state interest." Id. at 137.  But again, the fee was unrelated because the "privilege" at issue there was the basic ability to exercise a right secured by the federal Constitution – which is *not* a privilege or benefit that the state makes available in the first place.  See Murdock, 319 U.S. at 115.

      This Court has repeatedly sustained the use of cost-shifting user fees – but always in the context of activities lying away from the "core" of constitutional

protection.  For example, this Court upheld a $5 New York City fee for a sound amplification permit on the rationale that the fee was "less than the actual costs of the municipal service required."  U.S. Labor Party v. Codd, 527 F.3d 118, 119 (2d Cir. 1975); see also Turley v. Police Dep't, 167 F.3d 757, 761 (2d Cir. 1999) (upholding $45 fee for amplified sound device).  However, the use of a megaphone is not the basic act of "speech," and indeed, municipalities can impose substantial restrictions on amplified sound devices that they could not impose on the basic act of speaking itself.  See Kovacs v. Cooper, 336 U.S. 77, 87-88 (1949).

To sustain the City's $340 license fee, the Panel relied on cases that had upheld license fees imposed on non-core activities – specifically, the use of public facilities, and the ability to engage in commercial activities.  See Slip Op. pp. 9-10; see also E. Conn. Citizens Action Group v. Powers, 723 F.2d 1050, 1052 (2d Cir. 1983) (use of state-owned railbed for a march); Int'l Women's Day, 619 F.3d at 350 (use of city streets for a march); Nat'l Awareness Found. v. Abrams, 50 F.3d 1159, 1161 (2d Cir. 1995) (registration fee required to work as a "professional fund-raiser").  These activities simply do not support the imposition of substantial fees on the basic ability to exercise the core of an enumerated constitutional right.

## CONCLUSION

This case presents a unique opportunity for the *en banc* Court to provide useful guidance in a developing area of the law.  The Panel's decision conflicts with decisions of the Supreme Court, and *en banc* review is appropriate.

Dated:        July 23, 2013

David D. Jensen
DAVID JENSEN PLLC
111 John Street, Suite 230
New York, New York 10038
(212) 380-6615 tel
(917) 591-1318 fax
*david@djensenpllc.com*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 3,531 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B).

2.      This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type.

Dated:      July 23, 2013

 s/ David D. Jensen
David D. Jensen
Attorney for Plaintiffs-Appellants

## CERTIFICATE OF SERVICE

On 23 July 2013 I served the foregoing Petition by electronically filing it with the Court's CM/ECF system, which generates a Notice of Filing and effects service upon counsel for all parties in the case.

I affirm the foregoing statement under penalty of perjury under the laws of the United States of America.

Dated:        July 13, 2013

 s/ David D. Jensen_____

David D. Jensen

Attorney for Plaintiffs-Appellants